UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| B&S TRANSPORT, INC., et al., ) | CASE NO. 5:13-cv-2793 |
| ) | |
| PLAINTIFFS, ) | JUDGE SARA LIOI |
| ) | |
| vs. ) | |
| ) | OPINION AND ORDER |
| BRIDGESTONE AMERICAS TIRE ) | |
| OPERATIONS, LLC, et al., ) | |
| ) | |
| DEFENDANTS. ) | |

This matter is before the Court on plaintiffs' motion styled as a motion for temporary restraining order, preliminary injunction, and permanent injunction. (Doc. No. 4.) Defendants filed a response (Doc. No. 17), and plaintiffs filed a reply. (Doc. No. 19.) The Court has already denied plaintiffs' motion for temporary restraining order. (Minute Order, Jan. 15, 2014.) Plaintiffs subsequently submitted their motion for preliminary injunction without any further evidence or arguments in support. (Doc. No. 24.) Likewise, defendants offered no additional evidence or arguments in support of their opposition to the motion. (Doc. No. 29.) Accordingly, the Court construes the motion as a motion for preliminary injunction and the same is DENIED.

I.  Factual Background

Plaintiff Ronnie Harris is the founder and majority shareholder of plaintiff B&S Transport, Inc. ("B&S") (Doc. No. 4 at 35.) B&S, a self-described African-American company, became an authorized dealer of Firestone tires sometime between 1977 and 1979 and of

Bridgestone tires after Bridgestone acquired Firestone. (*Id*. at 36.) B&S primarily serves government entities. (*Id*. at 41.) Plaintiffs allege the parties' relationship is governed by a 1988 or 1990 contract (exact year unknown[1]) of indefinite duration that, by its own terms and through the parties' course of performance, provided for termination only for good cause. (Doc. No. 1 at 5.) The contract also allowed B&S to seek tires sales without geographical restrictions, unlike most dealer agreements. (*Id*.) Allegedly partly written and partly oral, this contract has not been produced by either party.

Defendants dispute these terms, but admit that no written contract exists between B&S and Bridgestone. (Doc. No. 17 at 192.) After Bridgestone acquired Firestone, well after the creation of the parties' contract, Bridgestone sought to have Harris and B&S enter into Bridgestone's authorized dealer agreement, which provided for termination by either party without cause on 30 days' notice. Harris and B&S pointedly and repeatedly refused to sign it.[2] (*Id.* at 193; Doc. No. 18 at 211[3].)

On January 11, 2011, Bridgestone sent B&S an email containing pricing information requested by B&S in connection with B&S's bids for government contracts. (Doc. No. 4 at 37.) In accordance with its prior dealings with B&S as well as its general business practices, Bridgestone stated that its pricing information pertained only to the individual government contracts and did not constitute a "guarantee to supply" or a "commitment to

---

[1] *Compare* Doc. No. 4-2 at 65 ("In close proximity to Firestone's acquisition" by Bridgestone in 1988, "B&S Transport entered into an agreement with Firestone, which was partly in writing and partly oral[.]") *with* Doc. No. 1 at 5 ("[O]n or about February, 1990, a written contract was entered into between B&S and Firestone[.]").
[2] Defendants have submitted a copy of Bridgestone's standard authorized dealer agreement. (Doc. No. 18.) It provides for termination "at any time, by either party, without cause, upon 30 days prior written notice to the other party[.]" (*Id*. at 224.)
[3] The exact date of Bridgestone's first request to Harris and B&S to sign the agreement is unknown. In his affidavit, Landers Gaines states that Bridgestone made multiple such requests in the eight years in which Gaines had direct dealings and contacts with Harris and B&S. (Doc. No. 18 at 211.) Gaines does not precisely pinpoint those eight years, but, in the context of his affidavit, they likely were 2005-2013.

supply" any product therein. (*See, e.g.*, Doc. No. 4-3 at 76.) Based on that information, throughout 2011, plaintiffs bid on and won six government contracts with the Defense Logistics Agency, all of which consisted of two base years with one possible option year, to be exercised at the discretion of the government. (Doc. No. 4 at 38.)

On February 28, 2013, Harris received a letter from Kurt A. Danielson, President, Bridgestone Commercial Solutions, informing Harris "that Bridgestone has decided to terminate B&S Transport as an Authorized Dealer of all Bridgestone and Firestone brand product lines[.]" (Doc. No. 4-8 at 107.) The letter further clarified that B&S would remain an "Authorized Dealer" until December 31, 2013. (*Id.*) Beginning January 1, 2014, Bridgestone would cease shipping tires to B&S. Though plaintiffs claim that the letter came from a company official with whom plaintiffs had never done business, the letter clearly indicates that it "follow[ed] up to [Harris's] meeting on February 28, 2013 with Mr. Gary Clark and Mr. Landers Gaines to discuss the end of the longstanding relationship between [the parties.]" (*Id.*) Gaines submitted an affidavit, providing that he "had direct business dealing and contacts with B&S Transport, Inc. and its owner, Ronnie Harris, for about eight years." (Doc. No. 18 at 211.) Gaines further stated that he met with Harris on February 28, 2013, and personally delivered the termination letter to him. (*Id.* at 212.)

In October 2013, nearly eight months after B&S received the termination letter, the government exercised the third optional year on all six of the above-described contracts. (Doc. No. 4-5.) All six contracts now run through October 2014. Harris subsequently contacted defendants about the February 2013 termination letter and received a letter on November 14, 2013, from Jon A. Stanley, Associate General Counsel, in response. (Doc. No. 4-10 at 114.) Noting that defendants "provided B&S Transport, Inc. with almost ten (10) months notification

3

of its decision[,]" Stanley reaffirmed defendants' termination of B&S as a Bridgestone supplier. (*Id.*)

Plaintiffs claim that, after Bridgestone received the February 2013 letter, it lost contract awards to Pomp's Tire Service, Inc. ("Pomp's"), a non-minority tire distributor. (Doc. No. 4 at 40.) Specifically, plaintiffs claim that Pomp's received pricing information from Bridgestone that enabled it to bid $301.11 per tire on a Defense Logistics Agency contract, while plaintiffs' pricing information required it to submit a much higher bid: $352.12 per tire. (*Id.*) Unsurprisingly, B&S lost that contract, and allegedly three other contracts, to Pomp's. (*Id.*)

Plaintiffs filed their complaint on December 19, 2013. The complaint asserts the following causes of action: (1) violation of 42 U.S.C. § 1981; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) promissory estoppel; (5) tortious interference with contract; and (6) fraud. (Doc. No. 1 at 8-23.)[4] That same day, plaintiffs filed a motion for temporary restraining order, preliminary injunction, and permanent injunction. (Doc. No. 4.) Plaintiffs asked the Court to: (1) enjoin defendants from terminating B&S as a supplier; (2) order defendants to reinstate B&S as an Authorized Dealer of Bridgestone tires; (3) order defendants to fill B&S's tire orders; (4) order defendants to make their tires available to B&S at same prices as other suppliers; (5) enjoin defendants from preventing delivery of Bridgestone tires to B&S and its customers; (6) enjoin defendants from soliciting business from B&S clients; and (7) prevent defendants from providing non-minority companies with more advance notice of defendants' pricing. (Doc. No. 4 at 45-46.)

---

[4] The sixth and seventh claims for relief—specific performance and injunctive relief—are remedies, not causes of action. (Doc. No. 1 at 23-24.)

4

The Court conducted a hearing on plaintiffs' motion for temporary restraining order on January 14, 2014, and, after hearing from counsel for both parties, denied the motion. (Minute Order, Jan. 15, 2014.) Plaintiffs continue to assert their motion for preliminary injunction.

II.  LAW AND ANALYSIS

In considering preliminary injunctive relief, the district court must weigh the following four factors:

(1) the plaintiff's likelihood of success on the merits;
(2) whether the plaintiff will suffer irreparable harm without the injunction;
(3) whether granting the injunction will cause substantial harm to others; and
(4) the impact of the injunction on the public interest.

*Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). No single factor is determinative. Rather, the Court must balance the factors to determine whether they weigh in favor of granting the injunction. *Id*.

The proof required to obtain a preliminary injunction is "much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). "[P]reliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Id*. (internal quotation marks and alterations omitted). It is against this legal backdrop that the Court evaluates plaintiff's motion and considers the four factors.

1. Likelihood of Success on the Merits

Under the first factor, likelihood of success on the merits, plaintiffs must demonstrate "more than a mere possibility of success[;]" however, "if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair

5

ground for litigation," an injunction may issue. *Am. Standard, Inc. v. Meehan*, 517 F. Supp. 2d 976, 982 (N.D. Ohio 2007) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). When plaintiffs assert multiple claims, they need only demonstrate "a likelihood of success on the merits on the 'central issue' of [their] claims" to satisfy the substantial likelihood of success prong. *Skurka Aerospace, Inc. v. Eaton Aerospace, L.L.C.*, 781 F. Supp. 2d 561, 565-67 (N.D. Ohio 2011) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)). Addressing each claim in turn, plaintiffs have shown a *possibility* of success on some claims, but no *likelihood* of success on any claim.

    a. § 1981 Claim

Plaintiffs provide the following facts in support of their § 1981 claim. Plaintiffs allege that B&S was, at the time it received the termination letter, the only African-American supplier of Bridgestone tires to the government.[5] (Doc. No. 1 at 9-10.) Because Bridgestone terminated B&S but did not terminate Pomp's, which plaintiffs allege is the sole (non-minority) supplier authorized to sell to the government, plaintiffs claim that they will succeed on the merits of their § 1981 claim. Plaintiffs also claim that, in April 2013, Pomp's received "lower pricing that was neither known to B&S Transport nor 'valid' for another four (4) months to come." (Doc. No. 4 at 40.) Specifically, Pomp's received pricing information of $301.12 per tire for a government contract, while B&S received $352.12 per tire. (*Id.*) As a result, B&S lost at least three contract awards to Pomp's.

In opposition, defendants claim that Bridgestone terminated B&S because the latter lacked both warehouse capabilities for inventory storage and full tire-related services for its

---

[5] In his affidavit, Gaines stated that Bridgestone "has dealership agreements with other minority-owned businesses[,]" but does not allege that those businesses are government suppliers. (Doc. No. 18 at 212.)

customers, both of which Bridgestone actively sought in its suppliers. (Doc. No. 18 at 212-13.) Indeed, B&S was rare, perhaps unique, among Bridgestone suppliers in lacking those services. (Doc. No. 17 at 194-95.) Defendants also argue that B&S's failure to adhere to Bridgestone policies, as well as Harris's unpleasant and difficult manner, prompted Bridgestone to terminate B&S as a supplier. (*Id*. at 195-96.) Finally, defendants allege that Pomp's received the same pricing information as all Bridgestone suppliers. Pomp's price of $301.12 per tire reflected the price "available to all [Bridgestone] dealers, including B&S, as long as the customer met certain size requirements[,]" while B&S's price of $352.12 per tire reflected "a 2012-2013 GSA contract that wasn't renewed when it expired in April 2013." (*Id*. at 200.) Quite simply, defendants explain, comparing the 2013 price quote to a particular 2012 contract "is comparing apples to oranges." (*Id*.)

Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). To make a valid claim under the statute, plaintiff "must plead and prove that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Id*. A plaintiff can prove discriminatory intent—the second requirement—by inference, using the *McDonnell Douglas* burden-shifting framework. *Id*. (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973)). Under that framework, plaintiff "must present a *prima facie* case, at which point the defendant must come forward with a legitimate, non-discriminatory reason for its action. If the defendant can respond with such a reason for the [] action, the plaintiff has the burden of offering evidence that the defendant's justification is a pretext that

7

masks its true discriminatory intent." *Id*. at 359-60. A pretextual reason has no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to warrant the challenged conduct. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). The parties do not dispute the first prong of plaintiffs' § 1981 claim, but vigorously contest defendants' discriminatory intent and defendants' proffered non-discriminatory reason for the termination.

In a similar contract termination case, a district court found a high likelihood of success on the § 1981 claim. There, the state of Ohio hired plaintiff, a minority-owned company, to conduct a predicate study. *D.J. Miller & Assocs., Inc. v. Ohio Dep't of Admin. Srvs.*, 115 F. Supp. 2d 872, 874 (S.D. Ohio 2000). Plaintiff's primary researcher left the company, and the state of Ohio rejected the qualified replacement candidate plaintiff submitted for approval. The state of Ohio instead awarded the predicate study to a majority-owned company. The court ruled that defendant's "legitimate, non-discriminatory reason for terminating" plaintiff—that the replacement researcher was unqualified—was "a pretext for unlawful discrimination." *Id*. at 881. The court found the replacement researcher easily met the contract's requirements for a qualified principal researcher and plaintiff had, accordingly, shown a high likelihood of success on the merits. On the other hand, when the minority-owned business has clearly defined deficiencies when compared to the non-minority company, there is no violation of § 1981 in choosing another company for a contract. *See Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club, LLC*, 204 F. App'x 528, 537 (6th Cir. 2006) (awarding contract to non-minority group had legitimate, non-discriminatory justification when non-minority group offered more stability and better financing); *see also Brown v. Am. Honda Motor Co., Inc.*, 939 F.2d 946, 951 (11th Cir. 1991) (no § 1981 claim when non-minority group received Honda dealership because they were sole group with prior relationship with Honda to propose selling Hondas exclusively).

Unlike *D.J. Miller*, the § 1981 claim does not present a high likelihood of success on the merits. In the February 2013 letter, Bridgestone cited its "change in distribution and go to market solutions strategies" to justify terminating B&S as a supplier. Specifically, Bridgestone now desires its suppliers to stock Bridgestone inventory in warehouses and provide full tire-related services to customers, neither of which B&S was or is equipped to do. Plaintiffs do not allege that B&S provides such services. Rather, they argue that B&S has provided exemplary services as a Bridgestone supplier for nearly three decades and Bridgestone had no non-discriminatory reason to terminate B&S. For purposes of the Court's analysis at this stage, Bridgestone has offered a legitimate, non-discriminatory reason for terminating B&S while retaining Pomp's: Pomp's offered better services and, thus, plaintiffs have not shown a likelihood of success as to this issue. Nor, at this stage, have plaintiffs shown a likelihood of success in establishing discrimination in the prices offered to B&S versus Pomp's. Instead, defendants have explained that the price discrepancy cited by plaintiffs resulted from comparing a 2012 contract price to a 2013 price quote. (Doc. No. 17 at 200.) Given the facts as presented at this early stage of the proceedings, plaintiffs have failed to show a substantial likelihood of success on their § 1981 claim.

   b. Breach of Contract Claim

Plaintiffs further allege that B&S's contract with Bridgestone provided for termination only upon good cause. In Ohio, "[a] breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." *Lawrence v. Lorain Cnty. Cmty. Coll.*, 127 Ohio App. 3d 546, 549, 713 N.E.2d 478 (Ohio Ct. App. 1998).

Ohio law further provides, "a distributorship agreement with no express provision as to duration is generally *terminable at will* by either party after a reasonable duration and on reasonable notice." *Miller v. Wikel Mfg. Co., Inc.*, 46 Ohio St. 3d 76, 79, 545 N.E.2d 76 (1989) (emphasis added).

Whether plaintiff has demonstrated substantial likelihood of success on the breach of contract claim depends wholly on which termination clause applies to the parties. Plaintiffs assert that Bridgestone could only terminate the contract for good cause, relying on Harris's affidavit, wherein Harris states, per the partly written and partly oral contract between Bridgestone and B&S, the contract could not be terminated without good cause. (Doc. No. 4-2 at 65.) According to plaintiffs, that contract, now lost, still controls. According to plaintiffs, the essential terms of the contract[6] provided that: (1) B&S would aggressively pursue government and minority set-aside business; (2) B&S was not geographically restricted; (3) B&S would submit sales on a deal-by-deal basis; (4) B&S would receive the same prices as every other dealer; (5) B&S would make timely payments; (6) the contract was of indefinite duration;[7] (7) the contract would not be terminated without good cause; and (8) the parties would abide by the contract in good faith. (Doc. No. 1 at 14.) Plaintiffs do not indicate which contract provisions were written and which were oral. According to plaintiffs, the February 2013 letter and

---

[6] Plaintiffs claim this contract was "in effect a franchise agreement." (Doc. No. 4-2 at 65.)

[7] Though plaintiffs allege a contract of indefinite duration, the Statute of Frauds does not govern this case. Ohio law requires certain agreements to be in writing, including "an agreement that is not to be performed within one year from the making thereof." Ohio Rev. Code § 1335.05. The party seeking to enforce such a contract must produce "some memorandum or note thereof [] in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized." *Id*. The Ohio Supreme Court has held, however, that "where the time for performance under an agreement is indefinite, or is dependent upon a contingency which may or may not happen within a year, the agreement does not fall within the Statute of Frauds." *Sherman v. Haines*, 73 Ohio St. 3d 125, 127 (1995). The version of the contract that plaintiffs allege is indefinite. Moreover, the contract alleged by plaintiffs is dependent upon good cause to terminate, which may or may not happen within a year. Thus, the Statute of Frauds does not require a writing.

November 2013 follow-up letter terminated the contract without good cause, constituting breach of contract.

In opposition, defendants claim that they could terminate the relationship with or without cause, but admit that they cannot produce a written contract to that effect. Defendants instead argue that the Court should not infer a "good cause" contract absent a writing. *See Miller v. Wikel Mfg. Co., Inc.*, *supra*; *Excello Wine Co. v. Monsieur Henri Wines, Ltd*., 474 F. Supp. 203, 208 (S.D. Ohio 1979) ("When a distributorship agreement such as this has no express term [of duration], the persuasive authority holds that it is terminable without cause after a reasonable period of existence and upon reasonable notice.").

Considering the parties' evidence to date, plaintiffs have shown that no *specific* termination-without-cause contract applied, but they have offered only the Harris affidavit in support of an indefinite, termination-for-cause contract. Without a writing or a more definite expression that the parties assented to an indefinite "good cause" contract, it may be difficult for plaintiffs to overcome the general rule that indefinite contracts are terminable at will. *Miller*, 46 Ohio St. 3d at 78 ("[A] distributorship agreement with no express provision as to duration is generally terminable at will by either party after a reasonable duration and on reasonable notice."); *Consun Food Indus., Inc. v. Fowkes*, 81 Ohio App. 3d 63, 68, 610 N.E.2d 463 (1991) ("Where parties to a contract express no period for its duration . . ., the only reasonable intention that can be imputed to the parties is that the contract may be terminated by either party upon the giving of reasonable notice[.]"). Even assuming that an indefinite "good cause" term applies, plaintiffs must also show that defendants breached by lacking "good cause" to terminate. Defendants have offered compelling reasons why Bridgestone terminated B&S: B&S's lack of warehousing capabilities and full tire-related services. Plaintiffs have not yet shown that these

11

reasons (amongst others) do not constitute "good cause." Plaintiffs have not, therefore, shown the requisite likelihood (1) that a termination-for-cause contract existed or (2) that defendants breached. Depending on the contractual evidence produced in this case, plaintiffs *might* succeed, but the Court cannot determine that plaintiffs are *likely* to succeed based on the evidence currently before it.

      c. Promissory Estoppel Claim

Plaintiffs allege that they reasonably relied on defendants' promise to supply tires when making the six Defense Logistics Agency contracts. Though Bridgestone's communications with B&S provided pricing information, not promises to supply, Bridgestone knew that the contracts lasted three years. Plaintiffs claim they reasonably relied on the prices provided in Bridgestone's communications, as well as their prior, multi-decade relationship with Bridgestone, in entering into multiple three-year contracts. In opposition, defendants rely on the uniform and repeated statements by Bridgestone that the pricing emails did not guarantee supply or evince commitment to supply. According to defendants, any reliance on Bridgestone's "promise," by way of pricing quotes, to supply tires in 2014 in the face of such disclaimers, not to mention the February 2013 letter, was unreasonable.

To assert a claim for promissory estoppel, plaintiffs must "establish the existence of a clear and unambiguous promise upon which it would be reasonable and foreseeable to rely and actual reliance on the promise to the detriment of one who relied." *Loadman Grp., L.L.C. v. Banco Popular N. Am.*, No. 4:10cv1759, 2013 WL 1150125, at *9 (N.D. Ohio Mar. 19, 2013) (citations omitted). "[T]he party who asserts the promissory-estoppel claim bears the burden to prove by clear and convincing evidence all the elements of the claim." *Dailey v. Craigmyle & Son Farms, L.L.C.*, 177 Ohio App. 3d 439, 446-47, 894 N.E.2d 1301 (Ohio Ct. App. 2008).

Courts do not look kindly on plaintiffs who rely on "promises" despite written disclaimers to the contrary. In the employment context, for example, courts have ruled that oral promises of job security do not override employee handbooks specifying that employment is at-will. These oral "promises" do not provide a basis for reasonable reliance. *Hagan v. Solideal Tire, Inc.*, No. 1:10 CV 241, 2011 WL 3444265, at *10 (N.D. Ohio Aug. 8, 2011) (collecting cases); *Lake v. Wolff Bros. Supply, Inc.*, No. 63959, 1993 WL 462866, at *6 (Ohio Ct. App. Nov. 10, 1993).

The Ohio Supreme Court has recognized, however, that the parties' "course of dealing" can modify the at-will nature of an employment agreement. *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 101, 483 N.E.2d 150 (1985) (syllabus). Even course of dealing arguments have their limits. For example, a dispute involving a similar "ongoing" relationship foretells, perhaps, the unlikelihood of plaintiffs' success on a promissory estoppel claim. *Book Dog Books, LLC v. Cengage Learning, Inc.*, No. 2:12-cv-1165, 2013 WL 65465 (S.D. Ohio Jan. 4, 2013). Seeking a TRO to force defendants to provide books to plaintiff bookstore for the winter 2013 semester, the bookstore alleged a "course of dealing whereby the Bookstores have always been able to use their accounts with the defendants to order books." *Id*. at *3. The bookstore relied on that course of dealing in running its business, though the bookstore owner could not "identify any specific promise made to him by defendants that they would supply books to the Bookstores on a going-forward basis." *Id*. at *4. The court concluded that plaintiff, for purposes of a TRO and/or preliminary injunction, did not demonstrate the requisite likelihood of success on its promissory estoppel claim. Though similar to this case, *Book Dog Books*' facts were more damning to plaintiff. There, defendant had previously frozen the bookstore's account and refused to ship books when it "lost confidence" in the bookstore, weakening the course of dealing argument. *Id*.

Here, no clear and unambiguous promise to supply tires appears in the records submitted by the parties. Indeed, each piece of correspondence regarding tire pricing contained the following language: "This is not a guarantee to supply[,]" and "This is not a commitment to supply any of these tires." (*See* Doc. No. 4-3 at 76.) As in the employment cases cited above, defendants here have provided repeated written statements that they do not guarantee the supply of tires and do not promise to sell. Further weakening the reasonableness of any reliance on Bridgestone supplying tires for the duration of the government contracts, defendants, in February 2013, told plaintiffs in no uncertain terms that they would not supply tires after December 31, 2013. For plaintiffs to continue to rely on a purported promise to supply tires in 2014 in the face of both the written disclaimers and the termination letter weighs against plaintiffs at this stage. At the very least, plaintiffs have not established the requisite likelihood of success on the merits.

    d.   Remaining Claims

In support of their remaining claims—breach of implied covenant of good faith and fair dealing, tortious interference with contract, and fraud—plaintiffs offer the same proofs of success on the merits as set forth above. A separate analysis of these claims is unnecessary; moreover, the three claims examined above are the "central claims" in this case. The Court points out, however, that defendants sent the termination letter in February 2013, long before the government exercised the third-year option on its contracts with B&S. In the end, this may foreclose any claim that defendants tortiously interfered with these contracts or fraudulently induced plaintiffs into entering into these contracts. At the time the government exercised the third-year option, the evidence appears to show that plaintiffs knew that they could not sell Bridgestone tires in 2014.

e. Summary

In total, plaintiffs have not carried their burden of showing likelihood of success on any central claim. Plaintiffs have not "raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp.*, 119 F.3d at 402. Though failure to show substantial likelihood of success alone is sufficient to deny the preliminary injunction, the Court shall nonetheless examine the remaining three factors. *See Pritchard v. Dent Wizard Int'l Corp.*, 275 F. Supp. 2d 903, 920 (S.D. Ohio 2003).

2. Irreparable Harm

Under the second factor, plaintiffs must demonstrate irreparable harm, should the Court fail to grant the motion for preliminary injunction. "It is well settled that 'a plaintiff's harm is not irreparable if it is fully compensable by money damages.'" *Bearing Distrib., Inc. v. Rockwell Automation, Inc.*, No. 1:06CV831, 2006 WL 1174279, at *7 (N.D. Ohio Apr. 28, 2006) (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). When, for example, impending contract termination forces plaintiff to locate product on the secondary market at higher cost or find replacement product, money damages fully compensate plaintiff's loss without the aid of an injunction. *See id.* "[L]oss of customer goodwill[,]" however, "often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (citation omitted). Moreover, "[t]he Sixth Circuit has recognized . . . possible business failure as irreparable harm." *Interstate Safety & Serv. Co., Inc. v. City of Cleveland*, No. 1:11CV1181, 2011 WL 5873108, at *2 (N.D. Ohio Nov. 18, 2011)

15

Plaintiffs allege the following irreparable harms: (1) ruination of B&S's relationship with its customers, particularly its government customers; (2) destruction of B&S's reputation; (3) inability to honor current B&S contracts or obtain new ones; and (4) termination of B&S employees. Given that plaintiffs mainly sell Bridgestone products and have no relationship with other major tire providers, plaintiffs have, pursuant to the case law cited above, demonstrated irreparable harm upon losing Authorized Dealer status.[8] This factor weighs in favor of the injunction; however, plaintiffs' long delay in bringing this lawsuit lessens the importance of the irreparable harm factor. *See Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("Though such delay may not warrant the denial of ultimate relief, it may standing alone, . . . preclude the granting of preliminary injunctive relief.") (citation omitted). Plaintiffs could have used any part of the last ten months of 2013 to repair or mitigate the harm they currently suffer.

3. Substantial Harm to Others and Impact on Public Interest

Because the final two factors require balancing of the interests and harms to various parties, they can be addressed together. The harm to others factor mainly focuses on the harm to defendants. When plaintiffs have "successfully sold" defendants' products "for many years" without complaint, one court agreed that little harm would come to defendants "by being required to continue to do business for a few more weeks in the manner in which they have been conducting business for years." *Tri County Wholesale Distrib., Inc. v. Labatt USA Operating Co., LLC*, No. 2:13-CV-317, 2013 WL 5657564, at *15 (S.D. Ohio Oct. 16, 2013). Continuation

---

[8] Defendants point out that B&S does not deal exclusively in Bridgestone tires, so its termination as a Bridgestone supplier will not irreparably harm the company. (Doc. No. 17 at 204-05.) Bridgestone tires represent 75% of plaintiffs' sales. (*Id*.) Courts have found irreparable harm in cases in which the defendant's products accounted for no more than 20-25% of plaintiff's sales. *Am. Standard, Inc. v. Meehan*, 517 F. Supp. 2d 976, 989 (N.D. Ohio 2007) (citing *Beaute Craft Supply Co. v. Revlon, Inc.*, 402 F. Supp. 385 (E.D. Mich. 1975)).

of a prior business relationship is less harmful, such courts conclude, than "requiring, most of, if not nearly all, [the customers] to find new [products or services.]" *Barron v. Vision Serv. Plan*, 575 F. Supp. 2d 825, 837 (N.D. Ohio 2008).

As to the public's interest, granting or denying a preliminary injunction can serve the public interest in enforcement of "voluntarily assumed contract obligations." *Certified Restoration*, 511 F.3d at 551; *see also Skurka*, 781 F. Supp. 2d at 579 ("[P]ublic's interest in upholding contract provisions supports granting Plaintiff's Motion for Preliminary Injunction."). On the other hand, "it is beyond responsible debate that the public interest is served when core societal values-in this case, a discrimination-free contracting process-are vindicated." *D.J. Miller*, 115 F. Supp. 2d at 884.

Under the final factors, plaintiffs claim that a preliminary injunction would harm neither Bridgestone nor any other party, noting that B&S always pays its invoices and Bridgestone would thus turn a profit from the sales the injunction would force it to make. Plaintiffs further argue that the public interest is served by preventing discrimination against minority business owners. (Doc. No. 4-1 at 61.) Finally, plaintiffs claim that denying the injunction would cause "a severe problem for the military because these tires are used on vehicles used for transporting heavy equipment throughout war zones." (Doc. No. 4 at 42.)

In opposition, defendants note that, while the public has little interest in the specific contract between Bridgestone and B&S, the public has an interest in general freedom of contract. (Doc. No. 17 at 208.) Forcing Bridgestone to continue contractual relations with B&S through an injunction would jeopardize this principle. Defendants also argue that no race discrimination occurred (after all, B&S was an authorized dealer for Bridgestone and its predecessors for decades); thus, the public's interest in preventing such discrimination is not at

17

risk. Nor is the public's interest in an adequately equipped military at issue—B&S could contract with any number of other tire manufacturers to honor its government contracts. (*Id*.) Additionally, Bridgestone claims that the military has not expressed any concern over the possibility that B&S may no longer be able to supply it with Bridgestone tires. (*Id.* at 197.)

The substantial harm factor favors plaintiffs. Defendants have been conducting business with plaintiffs for 28 years. No substantial harm would result by continuing the relationship for a few more weeks or months. The public interest factor is murkier. The public's interest in enforcing valid contracts does not favor either plaintiffs or defendants because neither party has produced an unassailable contract. Plaintiffs have not shown any likelihood of success on the § 1981 claim, so the public's interest in a discrimination-free contracting process is not implicated. Finally, allowing the plaintiffs to wait ten months before bringing this action also implicates the public interest. Granting a preliminary injunction after this enormous delay encourages parties to sit on their rights. While inconclusive, the public interest factor slightly favors defendants.

III. CONCLUSION

Considering all the factors, plaintiffs have not shown a substantial likelihood of success on any central claim.[9] While plaintiffs have shown that neither defendants nor any third party would be substantially harmed by a preliminary injunction, this factor is not controlling. Additionally, while plaintiffs have shown that they will be irreparably harmed, their long delay lessens the severity of this factor. The public interest factor, though inconclusive, slightly favors defendants. What drives the Court's decision, however, is that plaintiffs have failed to show the

---

[9] The Court's conclusion and foregoing analysis reflect only the Court's judgment with respect to the requirements for a preliminary injunction, not the eventual resolution of plaintiffs' claims on the merits.

most important factor—likelihood of success. As such, plaintiffs are not entitled to the extraordinary relief of a preliminary injunction and plaintiffs' motion for preliminary injunction is, therefore, DENIED.

**IT IS SO ORDERED**.

Dated: February 27, 2014

                                      **HONORABLE SARA LIOI**
                                      **UNITED STATES DISTRICT JUDGE**