# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| B&S TRANSPORT, INC., et al., | ) | CASE NO. 5:13-cv-2793 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| BRIDGESTONE AMERICAS TIRE | ) | |
| OPERATIONS, LLC, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This matter is before the Court on the parties' cross motions for summary judgment. Plaintiffs B&S Transport, Inc. ("B&S") and Ronnie Harris ("Harris") (collectively, "plaintiffs") seek partial summary judgment in their favor and against defendants Bridgestone Americas Tire Operations, LLC ("BATO") and Bridgestone Americas, Inc. ("BA") (collectively, "defendants" or "Bridgestone") with respect to three claims in the first amended complaint. (Doc. Nos. 86 and 87 ["Pl. Mot."].) Defendants opposed plaintiffs' motion (Doc. No. 105 ["Def. Opp'n"]), to which plaintiffs replied (Doc. No. 109 ["Pl. Reply"]).

Defendants seek summary judgment on all claims asserted in plaintiffs' first amended complaint, and on defendants' counterclaims. (Doc. No. 84 and 90 ["Def. Mot."].) Plaintiffs opposed defendants' motion (Doc. No. 106 ["Pl. Opp'n"]), to which defendants replied (Doc. No. 112 ["Def. Reply"]).

For the reasons that follow, defendants' motion for summary judgment is granted with respect to plaintiffs' first claim for relief pursuant to 42 U.S.C. § 1981, and

plaintiffs' motion for summary judgment with respect to the same claim is denied. Plaintiffs' state law claims, and defendants' counterclaims, are dismissed without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).

## I. BACKGROUND

The basic factual background of this case is not in dispute. Plaintiff Harris is the founder of plaintiff B&S and its majority stockholder; Harris's wife owns the remaining shares. (Doc. No. 47 (First Amended Complaint ["FAC"]) ¶ 14.) B&S is a minority owned self-described African American company, which became an authorized dealer of Firestone tires between 1977 and 1979, and of Bridgestone tires after Bridgestone acquired Firestone. (FAC ¶¶ 15, 17, 21-22.)

B&S and Bridgestone entered into the dealership agreement in 1991. It consists of a standard dealership agreement, amended by a letter agreement dated April 1, 1991 (FAC ¶ 23; Doc. No. 84-3, Ex. 1 ["Agreement"]), and is governed by the laws of the State of California (Agreement at 816[1], ¶ 13).

The agreement was tailored to allow B&S to pursue "'minority set-aside' business in order to obtain incremental sales and profits for both of us." (*Id*. at 819.) Because of the nature of this business, the agreement did not limit B&S geographically, and B&S was not required to provide service and warranty work performed by a typical tire dealer. (*Id*.) The agreement acknowledged that these differences provided B&S with "certain advantages" not provided to other dealers, and that "[i]t must be understood that these advantages are to be used only to obtain incremental business for us and to genuinely

---

[1] All references to page numbers are to the page identification numbers generated by the Court's electronic docketing system.

assist your minority enterprise, and not to disrupt our existing distribution system by merely displacing sales which would otherwise be made by our current dealers or by Bridgestone itself." (*Id*. at 819-20.)  Among the advantages to B&S was that Bridgestone would drop-ship tires directly to B&S's customers.[2] (Doc. No. 85-3 (Deposition of Ronnie Harris ["Harris Dep."]) at 1124 (59-60).[3])

Thus, defendants proposed to proceed on a "deal-specific" basis. B&S was not limited to "minority set-aside" business, but could pursue "any sales which are determined by Bridgestone to be incremental to Bridgestone." Moreover, B&S was free to deal in competitors' products, and defendants were free to utilize other minority enterprises. (Agreement at 820.)

> With respect to termination, the agreement provided that:
>
> At any time, and for any reason, either party may terminate this relationship with 30 days' written notice, provided that each party shall honor all commitments incurred prior to the effective date of any such termination. Upon such termination, all amounts due and owed Bridgestone are immediately payable. The intent of this approach is that our business should—and can best—grow over the long-term if it is based primarily on our developing relationship, upon whatever success we have, and upon mutual good faith.

(*Id.* at 820; *see also id*. at 815, ¶ 8(a).)

Over the years of the agreement, B&S purchased tires from Bridgestone on credit, sold the tires and was paid by its customers, then paid Bridgestone for the tires. (Harris Dep. at 1147-48 (152-53).) Harris personally guaranteed any indebtedness of B&S to

---

[2] Other dealers generally paid for shipping tires to their dealer locations or warehouses, and drop-shipping provided a competitive advantage to B&S. (Doc. No. 84 (Affidavit of Landers Gaines August 12, 2015 ["Gaines Aff. 8/12/15"]) ¶ 7.) Other Bridgestone dealers requested drop shipping, but those requests were denied. (Doc. No. 98-1 (Deposition of Landers Gaines May 20, 2015 ["Gaines Dep. 5/20/15"]) at 3257-58.)

[3] Some deposition transcripts were filed in a condensed format with four deposition transcript pages appearing on a single page. In those instances, the Court's citation includes the page identification number generated by the Court's electronic docketing system and, parenthetically, the original deposition transcript page numbers.

Bridgestone. (Doc. No. 65 at 655-660 ["Guaranty"].) The guaranty is governed by the laws of Tennessee. (*Id*. at 658, ¶ L.)

On February 28, 2013, Harris received a hand-delivered letter from Kurt Danielson ("Danielson"), President of Bridgestone Commercial Solutions, informing Harris that Bridgestone was terminating B&S's dealership agreement. (FAC ¶¶ 32-33; Doc. No. 47-2 ["Termination Letter"].) According to the letter, "Bridgestone's reasons for termination includes [sic] Bridgestone's change in distribution and [go-to-market] solutions strategies." (Termination Letter at 511.)  The letter states that, in order to give B&S time to wind down its business with Bridgestone, B&S would remain an authorized dealer until December 31, 2013, and Bridgestone would continue to provide B&S with tires through that date. (*Id*.)

The instant action arises from Bridgestone's termination of B&S's dealership, and the first amended complaint asserts one federal claim and five state claims. With respect to the federal claim, plaintiffs allege, pursuant to 42 U.S.C. § 1981, that Bridgestone's termination of the agreement was an intentional act of race discrimination and, after the termination letter was issued, B&S received less favorable treatment than did a non-minority Bridgestone dealer—Pomp's Tire Service, Inc. ("Pomp's"). (FAC ¶¶ 40-68.)

With respect to their state law claims, plaintiffs allege breach of contract (second claim—FAC ¶¶ 69-76), breach of implied covenant of good faith and fair dealing (third claim—FAC ¶¶ 77-86), promissory estoppel (fourth claim—FAC ¶¶ 87-97), intentional interference with contract (fifth claim—FAC ¶¶ 98-103), and fraud (sixth claim—FAC ¶¶ 104-113).

Defendants deny liability with respect to all of plaintiffs' claims, and assert counterclaims for breach of contract, account, and unjust enrichment, alleging that plaintiffs have not paid Bridgestone for tires purchased from Bridgestone on credit in the sum of $955,144.16. (Doc. Nos. 49 and 64 ["Counterclaims"].) In answering defendants' counterclaims, plaintiffs deny that defendants have been damaged at all, or in the sums alleged. (Doc. No. 70 ["Answer to Counterclaims"].)

Defendants move for summary judgment on all claims asserted in plaintiffs' first amended complaint, and on defendants' counterclaims. Plaintiffs seek partial summary judgment with respect to their first (§ 1981 race discrimination), second, (breach of contract), and third (breach of implied covenant of good faith) claims. The parties' cross motions with respect to plaintiffs' first, second, and third claims for relief essentially mirror their oppositions to the other's motion.

The foregoing is a summary of the background facts of this case. Additional facts will be discussed in greater detail as necessary and appropriate in the context of the Court's analysis of the parties' motions.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its resolution affects the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

The moving party must provide evidence to the court that demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Anderson*, 477 U.S. at 250. The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex*, 477 U.S. at 324. The Court must view all facts and evidence, and inferences that may be reasonably drawn therefrom, in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Summary judgment requires that a plaintiff present more than a scintilla of evidence to demonstrate each element of a prima facie case." *Garza v. Norfolk S. Ry. Co*. 536 F. App'x 517, 519 (6th Cir. 2013) (citing *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 268 (6th Cir. 2007)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (*quoting Anderson*, 477 U.S. at 252).

The district court's review on summary judgment is a threshold inquiry to determine whether there is the need for a trial due to genuine factual issues that must be resolved by a finder of fact because those issues may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003).

Summary judgment is required:

> against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing of an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex,* 477 U.S. at 322-23 (internal quotation marks and citation omitted).

The typical summary judgment standard of review "poses unique issues" when cross motions for summary judgment are filed. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001). In such case, the district court must evaluate each party's motion on its own merits, drawing all reasonable inferences against the moving party. *Id.* (citation omitted). If it is possible to draw inferences in either direction, then both motions for summary judgment should be denied. *Id.* at 592-93. The making of contradictory claims on summary judgment does not mean that if one is rejected the other must be accepted. *Id.*

**B. Objections to Affidavits**

As a preliminary matter, plaintiffs have objected to certain aspects of the following affidavits filed by the defendants in support of their dispositive motion: (1) Affidavit of Kurt Danielson (Doc. Nos. 84-10 and 91); (2) Affidavit of Landers Gaines ("Gaines") (Doc. No. 84-5); (3) Affidavit of Kevin Whitsett ("Whitsett") (Doc. No. 84-4); (4) Affidavit of Marcus Crews ("Crews") (Doc. No. 84-12); (5) Affidavit of Matthew Harmon ("Harmon") (Doc. No. 84-15); (6) Affidavit of Michelle Richardson ("Richardson") (Doc. No. 84-14); and (7) Affidavit of Linda Alberstadt ("Alberstadt") (Doc. No. 84-11). (Doc. No. 107.) Defendants have opposed plaintiffs' objections. (Doc. No. 113.) Additionally, in a footnote in plaintiffs' reply brief in support of their motion for partial summary judgment, plaintiffs "reserve all evidentiary objections" to "inadmissible materials" submitted by defendants in opposition to plaintiffs' motion for partial summary judgment pursuant to Fed. R. Civ. P. 56(c)(2) and 56(c)(4), and Fed. R. Evid. 802 and 901. (Pl. Reply at 4996 n. 2.) The Court will address these objections before analyzing the parties' summary judgment motions.

**1. Testimony of interested employees**

Plaintiffs' objections to five of the affidavits—Danielson, Gaines, Whitsett, Crews, and Alberstadt—are based upon *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). In these affidavits, the affiants aver that defendants terminated B&S's dealership agreement for legitimate business reasons, and not because of race. Plaintiffs contend that, pursuant to *Reeves*, these factually disputed statements from "interested" witnesses should be precluded.

In *Stratienko v. Cordis Corp.*, 429 F. 3d 592 (6th Cir. 2005), the Sixth Circuit held that the interpretation of *Reeves* advocated by the plaintiffs "leads to absurd consequences" because defendants are often only able to respond to a plaintiff's allegations through the testimony of their employees. *Stratienko*, 429 F. 3d at 598 (quoting *Almond v. ABB Indus. Sys., Inc.*, 56 F. App'x 672, 2003 WL 173640, at *2 (6th Cir. Jan. 22, 2003)). Thus, courts may consider the testimony or affidavits of a moving party's interested witnesses on summary judgment when the affidavits are not contradicted or the witness is not impeached or his credibility questioned. *Id.* (citations omitted). Accordingly, the plaintiffs' objections to the Court's consideration of the affidavits on summary judgment on the basis of *Reeves*, alone, are overruled.

### 2. Race of affiant

Plaintiffs also object to the affidavits of Gaines and Crews, in which each aver that the affiant is African American, on the grounds that the race of the affiant is irrelevant pursuant to Fed. R. Evid. 402. However, the race of the affiant is not entirely irrelevant, and plaintiffs' objections on that basis are overruled. Though not dispositive, the fact that a decision-maker is the same race as plaintiff may weaken an inference of discrimination and, to the extent it is appropriate, a court may consider the race of an affiant. *See Turner v. City of Akron*, No. 5:06CV3023, 2008 WL 45376, at *14 n.22 (N.D. Ohio Jan. 2, 2008), *aff'd,* 324 F. App'x 453 (6th Cir. 2009). However, the Court did not find it necessary to consider the race of Gaines or Crews in ruling on the parties' motions, and plaintiffs' objection is overruled.

### 3. Rule 56 objections

Plaintiffs object to the affidavits pursuant Fed. R. Civ. P. 56(c)(2) and (c)(4). Rule 56(c)(2) provides that "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." "[T]he objection contemplated by [the Rule] is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *Foreward Magazine, Inc. v. OverDrive, Inc*., No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011). Plaintiffs do not specify which statements by affiants could not be produced or introduced in the form of admissible evidence. Accordingly, plaintiffs' objections on the basis of Rule 56(c)(2) are overruled. That said, the Court will be mindful, as it always is on summary judgment, of any particular attested fact that could not be submitted in admissible form.

Rule 56(c)(4) provides that affidavits used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Plaintiffs do not specify which statements by affiants do not comply with the rule. Accordingly, plaintiffs' objections on the basis of Rule 56(c)(4) are overruled. As before, the Court will be mindful of any particular attested fact that specifically fails to meet the rule's requirements.

### 4. Evidentiary objections

Plaintiffs also object to the affidavits on the basis of Fed. R. Evid. 401, 402, 801, and 901. With respect to the Danielson affidavit, plaintiffs contend that the presentations discussed in the affidavit lack foundation, are not relevant, and contain hearsay. The presentations describe defendants' business strategies, which are relevant because those

strategies allegedly form a basis for terminating the agreement. Moreover, Danielson was a presenter and otherwise has personal knowledge of the presentations and defendants' business and marketing strategies. Danielson also avers that presentation materials attached as exhibits to his affidavit were prepared, maintained, and presented in the ordinary course of business. *See* Fed. R. Evid. 903(6). In addition, Danielson was deposed and subject to cross-examination regarding defendants' business strategies. Finally, the exhibits regarding defendants' business strategies are advanced to rebut plaintiffs' allegations that defendants' business strategies are fabricated and pretextual. *See* Fed. R. Evid. 801(d)(1). Plaintiffs' evidentiary objections to Danielson's affidavit are overruled.

With respect to the affidavit of Gaines, plaintiffs object to his reference to "various difficulties" with respect to Harris and B&S for lack of foundation as to detail of time place and issues. Plaintiffs object on the same basis with respect to Gaines's averments contrasting difficulties with Harris and the professionalism of a Bridgestone dealer that plaintiffs claim is similarly situated to B&S. But these statements in Gaines's affidavits are made from personal knowledge, and he was deposed and subject to cross-examination regarding his interactions with Harris, B&S, and Pomp's. Plaintiffs' evidentiary objections to Gaines's affidavit are overruled. That said, the Court did not consider Gaines's averments regarding difficulties with Harris in ruling on the parties' summary judgment motion.

The nature of plaintiffs' evidentiary objections, and the Court's analysis of those objections, to the affidavits of Whitsett, Crews, Harmon, Richardson, and Alberstadt is

the same, and the objections are overruled. As before, the Court will be mindful of any particular attested fact that fails to meet the requirements of the evidentiary rules.

**C. Federal Claim—Race Discrimination Pursuant to 42 U.S.C. § 1981**

Both sides move for summary judgment on count one of the first amended complaint, which alleges that Bridgestone intentionally discriminated against plaintiffs on the basis of race in terminating the dealership agreement. Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Spokojny v. Hampton*, 589 F. App'x 774, 777 (6th Cir. 2014) (citing *Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 867–68 (6th Cir. 2001)). To prevail on their § 1981 claim, plaintiffs must prove, by direct or circumstantial evidence, that Bridgestone intentionally discriminated against them on the basis of race when it terminated B&S's dealership agreement. *Id.* (citing *Amini v. Oberlin Coll.,* 440 F.3d 350, 358 (6th Cir. 2006)).

Bridgestone contends that there is no direct evidence that it terminated the agreement because of race. (Def. Mot. at 1818-21 (citing Harris Dep. at 1144-45 (140-44)).) Plaintiffs advance no direct evidence of race discrimination in opposition to Bridgestone's motion or in their motion for summary judgment. Rather, both parties focus their arguments on circumstantial evidence of discrimination.

Claims of race discrimination under § 1981 based on circumstantial evidence, even in a non-employment context, are analyzed using the familiar *McDonnell Douglas/Burdine* burden-shifting framework. Under that three-part framework, if plaintiffs sustain their initial burden of establishing a prima facie case, then the burden shifts to Bridgestone to articulate a legitimate, non-discriminatory reason for terminating

the dealership agreement. If Bridgestone can sustain this burden of production, then the burden shifts back to plaintiffs to advance evidence that Bridgestone's justification is a pretext for intentional discrimination. *Spokojny,* 589 F. App'x at 778-79 (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)); *Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club*, 204 F. App'x 528, 536-37 (6th Cir. 2006) (citing *McDonnell Douglas, Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); *TLC Realty 1 LLC v. Belfor USA Grp., Inc*., No. 3:13-cv-56, 2016 WL 98599, at *4 (S.D. Ohio Jan. 8, 2016) (applying *McDonnell Douglas* framework) (citing *White*, 533 F.3d at 391).

### 1. Plaintiffs fail to establish a prima facie case

As noted above, the burden-shifting framework of *McDonnell Douglas* is applied to prove intentional race discrimination in § 1981 cases by indirect evidence. But the model for a prima facie case announced in *McDonnell Douglas*[4] is not inflexible, and the components of a prima facie case may vary depending on differing factual situations. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n. 6, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802 n. 13); see also *Wil's Indus. Servs., Inc., v. United States Steel Corp.*, No. 2:07 cv 128, 2009 WL 2169663, at * 6 (N.D. Ind. July 17, 2009) (African American owned industrial cleaning service suspended from work for safety violations) (citing *Burdine*, 450 U.S. at 253 n. 6) (further

---

[4] Under *McDonnell Douglas* model, plaintiff may establish a prima face case of race discrimination by showing that "1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (citing *McDonnell Douglas*, 411 U.S. at 802)).

citation omitted); *TLC*, 2016 WL 98599, at *4 (African American owned contracting business not assigned work by defendant property restoration company for using independent contractors rather than its own employees to perform work) (citing *White*, 533 F.3d at 391).

No matter how one might describe the first three components of a prima facie case in this action, the parties' argument over whether plaintiff can establish a prima facie case focuses only on the fourth element—whether Bridgestone treated similarly situated, non-minority Bridgestone dealers, more favorably than it treated plaintiffs. Thus the Court will limit its analysis to that element.[5] Plaintiffs' burden to establish a prima facie case is not onerous and easily met. *TLC*, 2016 WL 98599, at *4 (citing *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008)); *see also Wheat*, 785 F.3d at 237 (citations omitted).

Plaintiffs contend that B&S and Pomp's are similarly situated because both engaged in the sales of Bridgestone tires to the government and are subject to the same Bridgestone rules and guidelines applicable to government sales. (Pl. Opp'n at 4455; Pl. Mot. at 1390.) Plaintiffs also contend that the "totality of the facts" establish a prima

---

[5] The parties' briefing focuses on whether Pomp's and B&S are similarly situated. But in plaintiffs' reply brief, plaintiffs state in passing that "the Opposition fails to rebut the undisputed evidence that, with respect to BATO dealers selling to the DLA [Defense Logistics Agency ("DLA")], B&S was replaced by a dealer outside of the protected class." (Pl. Reply at 4996.) The Court is doubtful that the concept of replacement applies to this analysis, but to the extent it does, the undisputed evidence does not establish that Pomp's replaced B&S with respect to government sales to DLA.

Plaintiffs advance the deposition testimony of Alberstadt, who testified that both B&S and Pomp's engaged in government sales to the DLA between 2005 and 2007—before Bridgestone terminated the dealership agreement. (Pl. Mot. at 1387; Doc. 95-2 (Deposition of Linda Alberstadt ["Alberstadt Dep."]) at 2485 (14).) To the extent plaintiffs claim that Pomp's replaced B&S with respect to sales to DLA because Pomp's continued those sales after B&S's dealership was terminated, such continued sales do not constitute replacement. *See e.g., Novotny v. Elsevier,* 291 F. App'x. 698, 702 (6th Cir. 2008) ("[Male employee] did not take [female plaintiff's] position. Rather, he took on her job responsibilities in addition to his own. Such an act does not constitute replacement.").

facie case because defendants did not eliminate the sale of Bridgestone tires to the government through authorized dealers, but "simply eliminated the authority of B&S, the only African-American dealer focused on making such sales, to continue with such sales, while allowing Pomp's, a White-owned company, to continue, to engage in government sales of Bridgestone tires." (Pl. Opp'n at 4456; *see also* Pl. Mot. at 1391-92.)

In order to be similarly situated under the *McDonnell Douglas/Burdine* analysis, a comparator need not be identical with the plaintiff in all respects. Rather, the comparators must be similar in all relevant aspects. *TLC*, 2016 WL 98599, at *5 (citing *Wright v. Murray Guard*, 455 F.3d 702, 710 (6th Cir. 2006) (citing *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 353 (6th Cir. 1998))); *see also Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (citing *Ercegovich,* 154 F.3d at 353); *Wheat*, 785 F.3d at 238 (quoting *Ercegovich*, 154 F.3d at 352); *Turner,* 2008 WL 45376, at *10 ("[T]he Sixth Circuit has warned against the employment of a rigid standard for comparison. Rather, the court has explained that 'in applying [this] standard courts should not demand exact correlation, but should instead seek relevant similarity.'") (quoting *Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir. 2000)) (other citation omitted).

The relevant aspects for comparison between B&S and Pomp's relate to the reason for termination of the dealership agreement. *TLC*, 2016 WL 98599, at *5 (relevant factors include whether TLC and Holt Construction were subject to the same standards with respect to use of subcontractors instead of their own employees); *Wil's*, 2009 WL 2169663, at *7 (plaintiff failed to show that non-minority contractors who committed serious safety violations were not suspended); *see also Wheat,* 785 F.3d at 238 ("[B]ecause Wheat's termination was spurred by a verbal, and potentially physical,

altercation, the relevant comparison between Wheat and Hatfield should involve only the two men's roles and actions in the contretemps."). The termination letter from Danielson states that Bridgestone's "reasons for termination includes [sic] Bridgestone's change in distribution and [go-to-market] solutions strategies." (Termination Letter at 511.)

Plaintiffs miss the mark by arguing that, because Pomp's and B&S both sold tires to the government, they are similarly situated. Bridgestone's stated reason for terminating the agreement relates to Bridgestone's distribution and marketing strategies. Pomp's continued ability to sell Bridgestone tires to the government is incidental to the fact that Pomp's remained an authorized Bridgestone dealer. Thus, in order to determine whether B&S and Pomp's are similarly situated, the relevant aspects for comparison are their attributes as authorized Bridgestone dealers relative to Bridgestone's articulated business strategies.

Harris operates B&S from his residence and has no storefront or retail locations, no Bridgestone signage, and little if any advertising or marketing. (Harris Dep. at 1144 (138-39); Doc. No. 84-4 (Affidavit of Kevin Whitsett ["Whitsett Aff."]) ¶ 5.) Harris converted a barn on his property, approximately 1,000 square feet in size, to utilize stalls for stacking tires and for storing tools and equipment. (Harris Dep. at 1122-23 (52-53); Whitsett Aff. ¶¶ 4-5 (B&S's storage capability is minimal compared to full-service dealers).) Excluding Harris and his wife, B&S employs four people. (Doc. No. 85-4 (Rule 30(b)(6) Deposition of Ronnie Harris ["Harris 30(b)(6) Dep."]) at 1167 (10).)

Although plaintiffs identified Pomp's as similarly situated for purposes of plaintiffs' § 1981 claim, Harris is only "vaguely" familiar with Pomp's. Harris knows that Pomp's has several operations throughout the country, but does not know about the

services that Pomp's offers, the tire lines it carries, or the number of people that Pomp's employs. (Harris Dep. at 1134-35 (100-03).)

Bridgestone employee Gaines had direct business dealings with both B&S and Pomp's. (Landers Aff. ¶¶ 4, 6; Doc. No. 98-1 (Deposition of Landers Gaines May 20, 2015 ["Gaines Dep. 5/20/15"]) at 3208, 3175.) Pomp's is a much larger dealer than B&S, with multiple locations throughout the country. (Gaines Dep. 5/20/15 at 3231-32). Gaines personally visited a number of Pomp's locations and had the opportunity to see its offices, warehouses, and equipment. (Doc. No. 98-2 (Deposition of Landers Gaines May 21, 2015 ["Gaines Dep. 5/21/15"]) at 3411.) Pomp's dealership, one of the largest in the country, provides a broad array of tire-related services at multiple retail locations. (Gaines Aff. ¶ 6.)

"Pomp's and B&S's businesses are quite dissimilar. B&S's business model was that of a tire broker rather than a servicing dealer. B&S has a few employees who operated from their home offices. B&S did not provide many, if any, tire-related services—certainly not close to the range of services provided by Pomp's. When compared to Pomp's, B&S's storage facilities were limited, and B&S did not carry full lines of tires like Pomp's does." (Gaines Aff. ¶ 8; *see also* Whitsett Aff. ¶ 5.)

Plaintiff does not dispute Bridgestone's characterization of B&S's business, or the evidence advanced by Bridgestone regarding the nature and scope of Pomp's retail and service operations. Nor do plaintiffs advance any evidence that a non-minority dealership with a business model like B&S's was not terminated by Bridgestone. Indeed, plaintiffs recognize that B&S's dealership agreement "was unique." (Pl. Opp'n at 4455.)

These dealership attributes are relevant aspects for comparison because Bridgestone's stated reason for termination of the agreement relates to its market strategies. As discussed in greater detail below, Bridgestone's self-described market strategies involved providing a full complement of tire-related services to Bridgestone customers through a unified and coordinated network of dealers to give Bridgestone a competitive edge in the marketplace through increased customer loyalty and profits. (Doc. No. 91 (Affidavit of Kurt Danielson ["Danielson Aff."]) ¶¶ 4-5.)

Plaintiffs posit that the issue of whether B&S and Pomp's are similarly situated should be resolved by a jury, citing *Bobo*, *supra*, in support. But *Bobo* is inapposite. In that case, whether plaintiff (who was terminated for an admitted wrongdoing) was similarly situated to other employees (who denied wrongdoing) turned on a credibility determination. In this case, the differences with respect to Pomp's and B&S's dealerships are undisputed, and no credibility determination is required.

No reasonable jury could find that B&S and Pomp's are similarly situated Bridgestone dealers in view of the undisputed differences in the nature and scope of their dealership operations relative to Bridgestone's stated market strategies. Thus, defendants are entitled to summary judgment on plaintiffs' § 1981 claim because plaintiff cannot establish a prima facie case of discrimination.[6]

---

[6] Bridgestone also contends that B&S and Pomp's are not similarly situated with respect to their dealer relationships with Bridgestone. Bridgestone claims that Harris would not follow Bridgestone's policies and procedures and was unprofessional in his dealings with Bridgestone employees, while Pomp's representatives complied with Bridgestone's policies and procedures and resolved issues with Bridgestone employees in a professional manner. Given the Court's disposition of the issue as it relates to Bridgestone's reason for termination specifically identified in the termination letter (i.e., Bridgestone's business strategies), the Court need not address this separate reason for the termination. The Court does acknowledge, however, that the reason stated in the termination letter was not exclusive, as the letter states that the "reasons for termination includes [sic] Bridgestone's change in distribution and [go-to-market] solutions strategies."

### 2. Bridgestone's non-discriminatory reason for termination

Assuming for the purpose of this analysis that plaintiffs were able to establish a prima facie case of intentional race discrimination, under the *McDonnell Douglas/Burdine* framework, the burden would shift to defendants to identify a legitimate, non-discriminatory reason for terminating the dealership agreement. Bridgestone asserts that B&S's tire broker dealership model was not aligned with Bridgestone's change in distribution and marketing strategy to increase profits through a unified network of dealers providing a broad array of tire-related services to Bridgestone's customers.

The dealership agreement between B&S and Bridgestone provides that the relationship could be terminated by either party at any time, for any reason, with 30 days' notice. The reason articulated by Bridgestone—lack of fit with Bridgestone's changed business strategies—satisfies Bridgestone's burden to identify a legitimate, non-discriminatory reason for terminating the dealership agreement.  *See e.g. Baseball at Trotwood,* 204 F. App'x at 537 (awarding contract to non-minority group had legitimate, non-discriminatory justification when non-minority group offered more stability and better financing); *Brown v. Am. Honda Motor Co., Inc*. 939 F.2d 946, 951 (11th Cir. 1991) (choice of dealership proposing to sell only Hondas rather than multiple car lines was legitimate reason for not selecting minority dealership proposal).

### 3. Plaintiffs fail to establish pretext

Once Bridgestone advances a legitimate non-discriminatory reason for its actions, the burden shifts to plaintiffs to establish that the stated reason is a pretext for intentional discrimination. A pretextual reason (1) has no basis in fact, (2) did not actually motivate

the defendant's challenged conduct, or (3) is insufficient to justify the challenged conduct. *Spokojny*, 589 F. App'x at 779 (citing *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003)); *Amini*, 440 F.3d at 360; *see also Bare v. Fed. Exp. Corp.*, 886 F. Supp. 2d 600, 612 (N.D. Ohio 2012) (citations omitted); *TLC*, 2016 WL 98599, at *6 (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).[7]

Plaintiffs contend that defendants' stated business reason for terminating B&S's dealership agreement has no basis in fact because: (1) the termination letter did not detail BATO's change in strategies; (2) Danielson was president of BATO's Commercial Services Division, which did the least business with B&S;[8] (3) BATO's business strategies did not apply to B&S's primary business of government sales; (4) Danielson did not consider that B&S's dealership agreement focused on government sales and did not require B&S to provide service; (5) B&S was not requested to make changes in its operations or provided with a pre-termination notice; and (6) defendants' post-litigation criticisms of Harris and B&S's operations are evidence of pretext. (Pl. Opp'n at 4457-59; Pl. Mot. at 1392-94.)

Plaintiffs have advanced no evidence that creates a genuine dispute of material fact with respect defendants' evidence that Bridgestone's move toward a full customer

---

[7] The first type of showing consists of evidence that the proffered basis for the adverse action is factually false. The second occurs when the plaintiff attempts to show circumstances that tend to prove it is more likely than not that the employer's explanation is a pretext, or cover-up. The third type of showing ordinarily consists of evidence that other employees, particularly those not in the protected class, were not subject to the adverse event even though they engaged in substantially identical conduct to that which the employer claims motivated the adverse action against plaintiff. *Lockett v. Marsh USA, Inc.*, No. 1:06CV00035, 2007 WL 2907894, at *8 (N.D. Ohio Oct. 3, 2007), *aff'd*, 354 F. App'x 984 (6th Cir. 2009) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

[8] Even assuming that plaintiffs' argument that Danielson was president of a division with which B&S did the least business is true, plaintiffs do not dispute Danielson's authority to make that decision or that, before making that decision, Danielson consulted with other Bridgestone employees who had knowledge of B&S's business, including Gaines, who had personal knowledge of Harris and a "clear understanding" of B&S's business operations. (Danielson Aff. ¶ 8; Gaines Dep. 5/20/15 at 3150.)

service distribution and marketing strategy began years before B&S's dealership agreement was terminated, or that these strategies were related to increasing price competition and decreased profits based on price alone. (*See* Danielson Aff. ¶¶ 5, 6 and exhibits thereto.) Indeed, the limited profit margins of a price-based business model is borne out by B&S's tire broker dealership. Harris testified that, on sales of $12 to $13 million dollars, B&S would either "break even," have a profit in the range of $30,000 to $40,000, "or be that much in deficit." (Harris Dep. at 1155 (182-83).) "I bid it low—you know, to get this business[.]" (*Id.*)

Bridgestone's stated business strategy is to increase profits through a service-oriented product delivery model that provides customers with a full complement of "wrap-around" tire-related services, which Bridgestone believes will provide a competitive edge in the market and increase Bridgestone and dealer profits. (Danielson Aff. ¶¶ 5, 6.)  Bridgestone has concluded that this strategy works best through a unified and coordinated dealer network "with dealers who have the ability and willingness to interact and work with customers in multiple diverse ways." (*Id* ¶ 5.)

But plaintiffs argue that Bridgestone's reason is simply a pretext for discrimination because Bridgestone's business strategy has no application to B&S's niche business in government sales. In support, plaintiffs cite the deposition testimony of three Bridgestone employees—Alberstadt, Jared Williams, and John Boynton—which plaintiffs contend proves that Bridgestone's strategies did not apply to B&S's

government sales. (Pl. Mot. at 1393; *see also* Pl. Opp'n at 4457-59.) But the deposition testimony of these individuals does not support plaintiffs' argument.[9]

Moreover, even if Bridgestone's strategy did not apply to B&S's tire broker model in governmental sales, that fact alone is insufficient to establish pretext. Bridgestone has determined that, in its view, the most effective strategy for increasing profits is through a unified network of dealers offering a full complement of services. Plaintiffs advance no evidence that dealers engaged in Bridgestone's service network and government sales are mutually exclusive or incompatible.[10] It is undisputed that B&S had minimal, if any, service capabilities. "Every dealer except for B&S can [deal with a customer who comes in for a warranty on a tire.] When someone comes in, that's the minimum we expect, that the [dealer] can take care [of]—[the dealer] can sell [the customer] the tire or fix the tire. That's our business." (Gaines Dep. 5/20/15 at 3148.)

B&S's dealership agreement did not require B&S to provide service, but it was not prohibited from doing so, and Gaines encouraged B&S to expand its business through

---

[9] Alberstadt testified that there was little or no change in clerical procedures for processing bids. (Alberstadt Dep. at 2486-89.) But when asked about a "change in market strategy at Bridgestone in 2013," Alberstadt responded that she did not work in marketing and could not answer about marketing strategies to the government. (Alberstadt Dep. at 2549-2550.) With respect to Jared Williams, plaintiffs state that he never received any written notification that BATO changed its distribution and go-to-market strategies with respect to government sale. But Williams testified that he worked in marketing "helping our dealers create a better customer experience for retail customers." With respect to the marketing of sales to the government and military, Williams testified that "[w]e relied on the government group to do most of that[.]" (Doc. No. 103 (Deposition of Jared Williams ["Williams Dep."] at 4329 (12-13).) Williams did testify that there was a shift in strategy by BATO toward doing business with large retailers, but marketing strategies with respect to government sales was not his focus. (*Id.* at 4343-44.) Finally with respect to John Boynton, he was asked if "the method in which Bridgestone has approached sales to the military or the government in general changed **since** January, February, 2013?" To this question, Boynton answered: "To my knowledge, no." (Doc. No. 110 (Deposition of John Boynton ["Boynton Dep."] at 5018 (42-43) (emphasis added).) But this testimony is of limited relevance since B&S's dealership agreement was terminated in February 2013, and BATO's shift in business strategy began before the termination in 2013. Moreover, Boynton was not generally familiar with the programs the Department of Defense used in purchasing tires. (Boynton Dep. at 5027-28 (81-82).)

[10] "Hundreds of BATO-authorized dealers—even other minority-owned dealers—are authorized to sell BATO tires to federal, state, and local governments."(Gaines Aff. ¶ 10.)

services related to its business area.[11] But Harris testified that he was "satisfied and comfortable" with his "low-key" home based operation, and Gaines testified that, "at every turn, [Harris] was not interested in participating" in the service areas Gaines discussed with him.[12] (Harris Dep. at 1144 (138-39); Gaines Dep. 5/20/15 at 3252.)

While Harris may have been comfortable with B&S's limited profits and low-key operation, there is no genuine dispute of material fact that Bridgestone was seeking to increase profit through a coordinated and unified network of dealers "who have the ability and willingness to interact and work with customers in multiple diverse ways." (Danielson Aff. ¶ 5.) The dealership agreement did not commit Bridgestone to B&S's tire broker business model in perpetuity, and specifically provides that the agreement could be terminated "for any reason" with 30 days' written notice. Bridgestone was not obligated under the agreement to continue supporting a dealership whose business model was not consistent with Bridgestone's stated overall business strategy to increase profits.

Bridgestone made a business decision that was unfavorable to plaintiffs. But the issue of pretext does not address the correctness or desirability of the reasons for that decision—even if Bridgestone's application of its business strategies was misguided or

---

[11] Gaines testified that he spoke with Harris about increasing B&S's business opportunities and profits by expanding his tire broker operation and offering tire-related services, including retreading, servicing trucks, doing more off road business, and about Bridgestone programs that B&S could participate in, including a retreading program with the Army. (Gaines Dep. 5/20/15 at 3251-55). Sales to governmental entities included fleet sales, and fleet service was identified by Bridgestone as a new way of capturing revenue. (*See* Boynton Dep. at 5034 (109); Doc. No. 91-1 at 1884 ("[F]leets are spending $50 billion on maintenance and repairs.").)

[12] It is true that B&S was never required by Bridgestone to expand its business or increase its service capabilities, nor was Harris warned that failure to do so could result in termination of the dealership agreement. But the agreement did not require notice, warning, or even cause, to terminate the agreement, and the fact that Bridgestone did not do so is not evidence of pretext. *See e.g. Coulter v. Deloitte Consulting, L.L.C.*, 79 F. App'x 864, 867-68 (6th Cir. 2003) (citations omitted) (termination without warning is insufficient to establish pretext when employee is an at-will employee subject to termination without warning, notice, cause, or prior disciplinary action, and there is no evidence that employer's policies required reprimand or warning prior to discharge).

wrong, plaintiffs cannot establish pretext so long as Bridgestone's reason is honestly held. "If there is no reasonable dispute that [the defendant] made a 'reasonably informed and considered decision' that demonstrates an 'honest belief' in the proffered reason for the [adverse action], the case should be dismissed because no reasonable juror could find that the [adverse action] was pretextual." *Trotwood*, 204 F. App'x at 536-37; *Braun v. Ultimate Jetcharters, Inc.*, No. 5:12-CV-01635, 2013 WL 3873238, at *18 (N.D. Ohio July 25, 2013) (In order for the reason to be "honestly held, '[a defendant] must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" (quoting *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998)).

Plaintiffs have failed to carry their burden under the *McDonnell Douglas/Burdine* burden-shifting framework to advance evidence from which a reasonable jury could conclude that Bridgestone's reason for terminating B&S's dealership agreement was pretextual, or could reasonably doubt that Bridgestone's justification was not honestly held. *See Marsilio v. Vigluicci*, No. 5:11CV1974, 2013 WL 1855975, at *11 (N.D. Ohio Apr. 30, 2013).

### 4. No evidence of racial animus

Plaintiffs have advanced no evidence of racial animus. Indeed, Bridgestone originally entered into the dealership agreement with B&S *because* it was a minority owned company in order to pursue minority set-aside business. Moreover, Bridgestone employees who participated in discussions and meetings regarding termination of B&S's dealership agreement, and who made the termination decision, aver that race played no role in those discussions and that the dealership was terminated for the reasons articulated

by Bridgestone. (Danielson Aff. ¶ 9; Gaines Aff. ¶ 5; Alberstadt Aff. ¶ 4.) Plaintiffs have advanced no evidence that the declarations of these individuals are not credible, or identified evidence in the record that contradicts their statements. *See Stratienko*, 429 F.3d at 598.

On summary judgment, the movant bears the burden of demonstrating the absence of a genuine issue of material fact. But "within the context of the *McDonnell Douglas/Burdine* burden-shifting framework, plaintiff[s] still must discharge [their] burden of rebutting [defendants'] articulated non-discriminatory reason. . . . . At the summary judgment stage, this requires plaintiff[s] to [produce] evidence from which a jury could reasonably doubt the [defendants'] explanation." *Marsilio*, 2013 WL 1855975, at *11 (internal quotation marks and citations omitted).

As discussed in detail, *supra*, plaintiffs have advanced no evidence from which a reasonable jury could conclude that plaintiffs have established a prima facie case, and even if they had, that Bridgestone's non-discriminatory reason for terminating B&S's dealership agreement was pretextual or otherwise not honestly held. In the absence of such evidence advanced by plaintiffs, and in the face of the undisputed evidence advanced by defendants, defendants have satisfied their burden on summary judgment of establishing that there is no genuine dispute of material fact that Bridgestone terminated

B&S's dealership agreement for reasons unrelated to race, and no reasonable jury could find in favor of plaintiffs on this issue.[13]

Accordingly, Bridgestone is entitled to judgment as a matter of law on plaintiffs' first claim for relief for intentional race discrimination in violation of 42. U.S.C. § 1981. Defendants' motion for summary judgment is granted with respect to plaintiffs' § 1981 claim, and plaintiffs' motion for summary judgment on their § 1981 claim is denied.

---

[13] Plaintiffs' § 1981 claim for relief alleges that defendants discriminated against plaintiffs on the basis of race by terminating B&S's dealership agreement, and after termination by providing Pomp's with notice and special pricing regarding upcoming government contracts, which allowed "Pomp's [to] underbid other suppliers, including B&S." (FAC ¶¶ 56-62.) Defendants move for judgment on plaintiffs' § 1981 claim, focusing their argument on termination of the dealership agreement. Plaintiffs' opposition to defendants' motion with respect to the § 1981 claim responds to defendants' arguments regarding termination, but is silent with respect to the portion of their § 1981 claim regarding pricing. Plaintiffs' own argument for summary judgment on their § 1981 claim also focuses on termination—their arguments regarding pricing are raised in the context of their state law claims for breach of contract and breach of implied covenant of good faith.

In *Anglers of the Au Sable v. United States Forest Service,* 565 F. Supp. 2d 812 (E.D. Mich. 2008), plaintiffs alleged that defendants violated the NFMA by approving a project that would, among other things, contribute to road density. In their motion for summary judgment, plaintiffs devoted one page to their NFMA claim with "not a word" about road density. When defendants moved for summary judgment on the NFMA claim, defendants also did not mention plaintiffs' allegation regarding road density, but "clearly sought to extinguish the whole of plaintiffs' claim under the Act." The court in *Anglers of the Au Sable* concluded that "[b]ecause the plaintiffs have shown no inclination to proceed on this allegation in the face of a motion for summary judgment seeking its resolution, the Court finds that the claim has been abandoned." *Anglers of the Au Sable,* 565 F. Supp. 2d at 839.

Plaintiffs have not addressed the issue of pricing in the face of defendants' omnibus motion for summary judgment on plaintiffs § 1981 claim. It is plaintiffs' burden to properly present their arguments for judgment to the Court, and not the Court's burden to collect fragments of arguments scattered in the context of other claims, and attempt to piece together plaintiffs' arguments regarding pricing in the context of their § 1981 claim. Accordingly, the Court deems plaintiffs' § 1981 claim with respect to pricing abandoned, and dismisses that portion of plaintiffs' § 1981 claim. *Anglers of the Au Sable,* 565 F. Supp. 2d at 839; *see also Bauer v. Cnty. of Saginaw,* 111 F. Supp. 3d 767, 782 (E.D. Mich. 2015), *aff'd sub nom. Bauer v. Saginaw Cnty.,* No. 15-1718, 2016 WL 502782 (6th Cir. Feb. 9, 2016) (claims may be abandoned by failing to address or support them in response to a motion for summary judgment) (citing *Clark v. City of Dublin, OH.,* 178 F. App'x. 522, 524–25 (6th Cir. 2006) (when a plaintiff did not respond to arguments asserted by a defendant's motion for summary judgment as to two claims, "the District Court did not err when it found that the Appellant abandoned [those] claims") and *Anglers of the Au Sable,* 565 F. Supp. 2d at 839 ("It is well settled that abandonment may occur where a party asserts a claim in its complaint, but then fails to address the issue in response to an omnibus motion for summary judgment.")); *Moates v. Hamilton Cnty.,* 976 F. Supp. 2d 984, 997 (E.D. Tenn. 2013) (citing *Anglers of the Au Sable,* 565 F. Supp. 2d at 839) (other citations omitted)); *Barrows v. City of Chattanooga, Tenn.,* No. 1:10-CV-280, 2012 WL 5451525, at *8 (E.D. Tenn. Nov. 7, 2012) (same) (citations omitted).

**D. State Law Claims**

Plaintiffs' asserted basis for this Court's jurisdiction is 28 U.S.C. §§ 1331 and 1343 (1), (2), (3), and (4). (FAC ¶ 1.) Plaintiffs ask the Court to exercise supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. 1367(a). (FAC ¶ 2.)[14] Defendants counterclaims are also asserted pursuant to the Court's supplemental jurisdiction. (Counterclaim at 535.)

The Court has determined that defendants are entitled to summary judgment on plaintiffs' sole federal claim, which formed the basis for the Court's original jurisdiction. With the dismissal of plaintiffs' § 1981 federal claim, the Court must now determine whether to exercise its supplemental jurisdiction over plaintiffs' state claims and defendants' state counterclaims. This decision is left to the sound discretion of the trial court. 28 U.S.C. § 1367(c); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966); *Pinney Dock & Transp. Co. v. Penn. Cent. Corp*., 196 F.3d 617, 620 (6th Cir. 1999) ("[D]istrict courts have broad discretion in deciding whether to exercise supplemental jurisdiction.").

"[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006); *see also Robert N. Clemens Trust v. Morgan Stanley DW, Inc.,* 485 F.3d 840, 853 (6th Cir. 2007) (citing *Carnegie–Mellon Univ. v. Cohill,* 484 U.S.

---

[14] 28 U.S.C. 1367(a) provides in relevant part:

> **(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

343, 350 n. 7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)); *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 173, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997) ("'(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction[.]'") (quoting 28 U.S.C. § 1367(c)(3)); *Hall v. Hebrank,* 102 F. Supp. 2d 844, 865 (S.D. Ohio 1999) (citing *Saglioccolo v. Eagle Ins. Co.,* 112 F.3d 226, 233 (6th Cir. 1997) ("It is well settled that a District Court may decline to exercise supplemental jurisdiction over state claims once it has dismissed all claims over which it possessed original jurisdiction.")); *Musson Theatrical, Inc. v. Fed. Exp. Corp.,* 89 F.3d 1244, 1254–55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.").

After reviewing the relevant considerations,[15] the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims and defendants counterclaims. *See Embassy Realty Investments, Inc. v. City of Cleveland*, 976 F. Supp. 2d 931, 944 (N.D. Ohio 2013), *aff'd,* 572 F. App'x 339 (6th Cir. 2014); *see also Province v. Cleveland Press Publ'g Co.*, 787 F.2d 1047, 1055 (6th Cir. 1986) ("overwhelming interest" in judicial economy may allow a district court to decide state law claims when federal claim is dismissed before trial) (quoting *Service, Hospital, Nursing Home and*

---

[15] "Depending on a host of factors, then—including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims—district courts may decline to exercise jurisdiction over supplemental state law claims. The statute thereby reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S. Ct. 523, 534, 139 L. Ed. 2d 525 (1997) (quoting *Cohill*, 484 U.S. at 350).

*Public Employees Union v. Commercial Property Services,* 755 F.2d 499, 506 n. 9 (6th Cir.1985) ("this circuit has moved away from the position that the court has discretion to retain jurisdiction over a pendent state claim where the federal claim has been dismissed before trial.")).

Accordingly, plaintiffs' state law claims, and defendants' counterclaims, are dismissed without prejudice, and the Court takes no position on the merits of these claims.

### III. CONCLUSION

For the reasons contained herein, defendants' motion for summary judgment on plaintiffs' first claim for relief for race discrimination is GRANTED, and plaintiffs' motion for summary judgment on that claim is DENIED. Plaintiffs' state law claims, and defendants' counterclaims, are dismissed without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).

**IT IS SO ORDERED**.

Dated: March 21, 2016

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**